IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

IN RE: RECEIVER                )    C/A No. 3:10-3141-MBS
                               )
                               )

## PLAN FOR CLAIMS ADMINISTRATION AND DISTRIBUTION OF PROCEEDS

The provisions of this Plan shall govern and control the resolution of the Claims of Depositors and Creditors of The Three Hebrew Boys ("3HB") and their related entities, especially Capital Consortium Group ("CCG"), as well as distribution of the Receiver Estate. These Claims arise from the operation of an illegal Ponzi scheme. Any and all objections by any person affected herein must be submitted and postmarked by August 31, 2011. A hearing on any timely but unresolved objections is set for September 21, 2011. Only unresolved objections properly submitted by August 31, 2011 will be heard at the September 21, 2011 hearing. The Receiver intends to make an initial distribution of **$19 million** to those Claimants determined to be eligible for an initial distribution. A second, much smaller distribution will occur in the future. This Plan adopts the Rising Tide theory of distribution which will return more money to Claimants who never received money or other benefits from the 3HB.

### SECTION 1: DEFINITIONS

Certain terms are defined in the substantive provision of this Plan. The following terms, as used throughout the Plan, are defined as follows:

**RECEIVER**: Beattie B. Ashmore, Esquire.

**RECEIVER TEAM:** Beattie B. Ashmore, Esquire and his associated staff including The Tollison Law Firm, P.A.

**3HB or THE THREE HEBREW BOYS**: Tony Pough, Joseph Brunson and Timothy McQueen doing business under the following names: Three Hebrew Boys, LLC; Capital Consortium Group, LLC; Brunson Outreach; Daniel Development Group, LLC; Wotteth Outreach Ministries; Vision Financial Service; Faith Ministries; Warrior Express; TMS Family Trust; Purpose Driven, LLC; Tri-Warrior Transit, LLC; Tri-Transit Logistics, LLC; KMF, Inc.; Vision Outreach; M&M Holdings; Meshak Holdings; Multiplex Educational Ministries; Wealth Creation and Prosperity Forum; Saint Peter and Paul, LLC; Free Gospel Church of our Lord; Hester Services; Ernest Hester, individually or d/b/a Hester Services; PMB; Beauty Extraordinaire; Ernestine Green; Brenda Irizarry; Dolly Bullock; and Heritage CTL Corp. including the subsidiaries, successors and assigns of the foregoing.

**IR or INDEPENDENT REPRESENTATIVE:** As part of the Ponzi scheme, the 3HB utilized Independent Representatives or IRs to recruit individuals to invest in a system of "programs" guaranteeing such results as the payoff of mortgages, credit cards, and car loans as well as highly profitable short and long term investments. In addition to payoffs received through participation in a "program," the IRs profited from their involvement in the scheme through the award of IR fees.

**DEPOSITOR**: Any known person or entity that made a deposit in a program (individual or joint) offered by the 3HB through CCG.

**POC or COURT-APPROVED PROOF OF CLAIM FORM:** The Proof of Claim form approved by the United States District Court for submitting a claim to the Receiver as filed on April 15, 2010 and received by the Receiver, whether timely or after the August 16, 2010 deadline, that indicates a Depositor's intent to claim money from the Receiver Estate.

**UNTIMELY POC:** A POC postmarked after the Court-imposed August 16, 2010 deadline for submission.

**CLAIMANT**: Someone who has submitted a POC to the Receiver, whether individually or jointly.

**CLAIM:** That which is generated from submitting a POC to the Receiver and has an accompanying Claimant number.

**COURT**: The United States District Court for the District of South Carolina, Columbia Division, the Honorable Margaret B. Seymour, presiding.

**PLAN**: This Plan for Claims Administration and Distribution of Proceeds.

**RECEIVER ESTATE**: All money and assets that have been or will be seized and/or acquired by the Receiver and are in the custody and control of the Receiver.

**RECEIVERSHIP ORDERS**: The Orders appointing the Receiver entered on September 5, 2007, superseded on October 10, 2008, and supplemented on April 15, 2010 and January 18, 2011.

**ACTUAL DEPOSIT:** The total principal amount of money deposited into a program or programs by a Claimant (whether as an individual or jointly with another) that has been **verified** by the Receiver.

**ACTUAL RETURN:** The amount of money from 3HB/CCG, if any, paid to or for the benefit of a Claimant that has been **verified** by the Receiver. The Actual Return includes any and all payments, including but not limited to, program payoffs, long-term residual payments, IR fees, gifts, early payouts, or otherwise.

2

**NET LOSS**: The calculated difference between the Actual Deposit and the Actual Return. **THIS IS NOT THE AMOUNT YOU WILL RECEIVE**. *The amount of distribution for each claim will be less than the Net Loss.*

**SCHEDULE OF NET LOSS AMOUNTS:** Schedule attached to the Plan that lists the Receiver's calculations, determinations and/or recommendations for each Claim. This Schedule will **NOT** list the amount you will receive in the initial distribution.

**CREDITORS:** All potential creditors of the 3HB.

**OBJECTION FORM**: The form used by a Claimant to submit objections with regard to the Schedule of Net Loss Amounts and the information contained therein.

**SECTION 2: CLAIMS ADMINISTRATION**

Section 2.1:    Notice

**Depositors**

On or about April 15, 2010, the Receiver mailed a Court Approved Proof of Claim form to all known Depositors. The Receiver also posted the Court Approved Proof of Claim form, and published notice of the Proof of Claim form in the Stars and Stripes on April 20, 23, 27 and 30, 2010 as well as May 4, 7, and 21, 2010 and in The State, The Fayetteville Observer, and USA Today the weeks of April 18, 25, and May 2, 2010.

Additionally, the Plan is on the Receiver's website: www.3hbreceiver.com. These notifications, coupled with the various communications provided for in the Plan, are reasonable and sufficient notice to all persons and entities regarding the Receiver's claims administration and funds distribution processes. Any and all written notices or other communications shall be delivered by First Class U.S. Mail to the address of record of all Claimants. Delivery shall be deemed effective three days after the date of mailing. **Claimants are responsible for keeping the Receiver informed as to their current mailing address.**

**Creditors**

In addition, this Plan will be published to all known or potential Creditors. All Creditors have until August 31, 2011 to submit a claim to the Receiver, along with supporting documentation.

Section 2.2:    Submission of Claims

The Receiver has concluded the process of reviewing the POCs. The deadline for submission was August 16, 2010 and the Receiver received approximately 4000 timely submitted POCs. It was the Claimants' responsibility to make sure that their POC was properly and timely submitted and that all required documentation was provided. As part of the review process, the

Receiver Team sent approximately 1000 deficiency letters to Claimants who submitted inaccurate or incomplete POCs. Any Claim that was either fraudulent, failed to conform to the requirements set forth in the POC, or failed to cure noted deficiencies may be recommended for disallowance.

**Section 2.3:    Untimely POCs**

The Court set a bar date of August 16, 2010 for submission of a properly executed POC to the Receiver. Despite this clear deadline, the Receiver has received approximately 200 Untimely POCs and that number continues to rise. As stated in the April 15, 2010 letter to investors attached to the POC, for "good cause" shown, the Court may allow POCs submitted after the August 16, 2010 deadline to be considered and request that the Receiver process these POCs. The Schedule of Net Loss Amounts specifies those POCs that were untimely. Any Claimant whose POC is identified as untimely **MUST** provide "good cause" in writing by August 31, 2011, by submitting an Objection Form as set forth in Section 3 below. Objection Forms purporting to state "good cause" for an Untimely POC submitted to the Receiver will subsequently be filed by the Receiver with the Court. No Untimely POC will be considered by the Receiver unless the United States District Court approves and so directs.

**Section 2.4:    Claims Analysis**

The Receiver and/or members of the Receiver Team have reviewed and analyzed each POC to determine its validity and correctness. The Receiver Team used the information provided by the Claimant and other information available to the Receiver Team, including, but not limited to, bank records and 3HB records.

The Schedule of Net Loss Amounts contains the Receiver's recommendations regarding the Name as it will Appear on Check, the Actual Deposit, the Actual Return and resulting Net Loss relevant to each Claim. The recommendations entered into the Schedule of Net Loss Amounts are listed alphabetically with the associated claim number. **These amounts do not reflect the actual amount a Claimant will receive for each Claim**.

In addition, there are a number of POCs for which the Receiver is recommending disallowance based on various legal and/or equitable reasons. The Claims for which the Receiver is recommending disallowance and the reason for such recommendations can be determined by referencing the Schedule of Net Loss Amounts.

Additionally, POCs that have been identified as untimely can be determined by referencing the Schedule of Net Loss Amounts.

After the time for submitting written objections has passed on August 31, 2011, and a final determination is made by the Court at or after a hearing scheduled for September 21, 2011 with regard to information set forth in the Schedule of Net Loss Amounts, the Receiver will calculate the amount of initial distribution for each Claim.

**SECTION 3: RESOLUTION OF OBJECTIONS**

If the Claimant **AGREES** with the information set forth in the Schedule of Net Loss Amounts, **NO FURTHER ACTION IS REQUIRED BY THE CLAIMANT.**

If a Claimant **DISAGREES** with any of the following:

(1)     the Name as it Appears on Check,
(2)     the Actual Deposit,
(3)     the Actual Return, and/or
(4)     the recommendation that a POC be disallowed for any reason,

the remaining provisions of Section 3 shall govern resolution of the dispute.

In addition, all Claimants whose POCs were untimely and would like to have the United States District Court allow their POC to be considered by the Receiver must proceed in accordance with the remaining provisions of Section 3.

**Section 3.1:     Objection Form**

Along with the Plan, each Claimant will receive an "Objection Form" that shall be completed by anyone (including those whose POCs have been identified as untimely and those Claimants for whom the Receiver is recommending disallowance) objecting to the information set forth in the Schedule of Net Loss Amounts, including the Name as it Appears on Check, the Actual Deposit, and/or the Actual Return as well as the Receiver's recommendation for disallowance of a POC. A separate Objection Form **must** be submitted for each Claim for which there is an objection.

Additionally, all Claimants whose POCs were untimely **MUST** submit an Objection Form indicating "good cause." Failure to submit an Objection Form will result in disallowance of an Untimely POC and waives any further objection to such disallowance.

The Objection Form will also be available on the Receiver's website, www.3hbreceiver.com.

**Section 3.2     Submission of Objection Form**

The Objection Form, along with all required supporting documentation shall be mailed to:

> Beattie B. Ashmore, Receiver 3HB
> PO Box 9199
> Greenville, SC  29604
> Attn:   Claim Dispute

**Only Objection Forms sent to the above address will be considered.** Objection Forms should **not** be filed with the Court, nor sent to The Tollison Law Firm, The Law Office of Beattie B. Ashmore, or the United States Attorneys Office.

The Objection Form **must** be postmarked by August 31, 2011. Failure to timely submit an Objection Form shall terminate any right to object to or otherwise contest the information set forth in the attached Schedule of Net Loss Amounts.

All Objection Forms that are not resolved prior to the hearing will be filed with the Court by the Receiver for consideration and adjudication at or after the hearing scheduled on September 21, 2011.

### Section 3.3    Resolution of Objections by the Court

Any Claimant whose Objection Form cannot be resolved by agreement with the Receiver prior to the September 21, 2011 hearing will be heard and the dispute decided by the Court at or immediately following the hearing. Only timely submitted Objection Forms will be considered. As to unresolved Objection Forms, failure to appear at the September 21, 2011 hearing is a waiver of any objections including those to the attached Schedule of Net Loss Amounts. The Court's decision regarding each Objection Form shall be final.

Additionally, as noted above, any Creditor who fails to submit a claim and attend Court on September 21, 2011 waives any claims to the Receiver Estate.

### Section 3.4    Notice Regarding Resolution of Objections Forms and Related Proceedings

Anyone who has submitted an Objection Form shall be entitled to notice only with respect to the adjudication of that particular Objection Form and shall not necessarily be entitled to notice of any other proceedings related to the action.

## SECTION 4 – DISTRIBUTION

### Section 4.1    Approval of Claims by the Court

Within 20 business days after the final determination by the Court with regard to all unresolved Objection Forms in accordance with Section 3 above, the Receiver shall file with the Court an Amended Schedule of Net Loss Amounts and Initial Distribution Amounts. All allowed Creditor claims will also be included in the Amended Schedule of Net Loss Amounts and Initial Distribution Amounts. This Amended Schedule of Net Loss Amounts and Initial Distribution Amounts will set forth the Court's final determination of Actual Deposit, Actual Return and resulting Net Loss as well as a final determination with regard to the allowance or disallowance of POCs for legal and/or equitable reasons and the allowance or disallowance of Untimely POCs. In addition, based upon the method of distribution set forth below, a calculation will be made and an amount will be provided as to the amount of the initial distribution for each allowed Claim. Subsequently, a final distribution will be made in this same manner.

**Section 4.2   Priority and Payment of Claims and Other Expenses.**

Claims will be prioritized and paid as follows:

(a)   **Administrative Expenses**. In accordance with the terms of the Receivership Orders, the Receiver has paid and will continue to pay expenses associated with the administration of the Receiver Estate. These expenses include, but are not necessarily limited to, professional fees and expenses, which have been and will continue to be subject to Court approval. The Receiver will establish as a reasonable reserve an amount necessary to pay future professional fees and expenses to be incurred in managing and liquidating assets, bringing and defending lawsuits and appeals, recovery of assets, conducting depositions and other discovery, filing of tax returns, review and analysis of additional financial documents and records and concluding the activities in this Receivership.

(b)   **Tax Liabilities.** To the extent there are any outstanding and published tax liabilities, the Receiver will reserve enough money from the initial distribution to pay any tax liabilities.

(c)   **Claims of Depositors and Unsecured Creditors.** Claims of Depositors and unsecured Creditors are general unsecured claims against the Receiver Estate and shall be paid with equal priority. The funds in the Receiver Estate are insufficient to pay these claims in full. The 3HB spent a substantial amount of the $80 million through lavish lifestyles and the promotion of the Ponzi scheme, which included making mortgage payments, car payments, and other distributions to Depositors and third parties. As such, Claims will be paid based upon the distribution method set forth below.

**Section 4.3   Distribution**

(a)   As soon as reasonably practical after the Court's approval of the Amended Schedule of Net Loss Amounts and Initial Distribution Amounts, the Receiver will make distributions in accordance with this Plan.

(b)   The amount to be paid to each Claimant will be calculated using the "Rising Tide" methodology, which is more fully explained below. In sum, the amounts of distribution shall be determined using the following formula:

> (Amount to Distribute) DIVIDED BY (Total Actual Deposits made by all allowed Claimants) MULTIPLIED BY (the Actual Deposit associated with each Claim) MINUS (Actual Return associated with each Claim).

The Receiver will make the initial distribution and at least one supplemental distribution (with approval to make the supplemental distribution a "final" distribution), as set forth below. For each distribution, the above formula will be applied as many times as needed until all of the "Amount to Distribute" is utilized. This method of distribution treats all payments defined within the term Actual Return as if they came from the Receiver Estate in a distribution.

7

**All Claimants who timely submitted a POC and have no Actual Return and for whom the Receiver has not recommended disallowance based on other legal or equitable reasons will receive a payment from the Receiver Estate in the initial distribution.**

**Furthermore, if the Actual Return is equal to or greater than the percentage of the Actual Deposit being paid under this calculation, the Claimant will receive no payment from the Receiver Estate. In other words, if you have already received through 3HB program payoffs, long-term residual payments, or otherwise an amount equal to or greater than the percentage of the Actual Deposit being paid to Claimants, you will likely receive no distribution from the Receiver Estate.**

For example:

**EXAMPLE 1:**

Assuming hypothetically there is $40,000 for distribution in the initial distribution and there are two Claimants, Claimant A and Claimant B who each deposited $100,000. In this case, the multiplier would be $40,000/$200,000 and would equal 20%. As such, 20% of the Actual Deposit for each Claimant is $20,000.

Assume also that Claimant A received an Actual Return of $20,000 from the Ponzi scheme and Claimant B received no Actual Return. Because Claimant A received an Actual Return of $20,000, he will get nothing in the initial distribution. Claimant B, because he received no Actual Return, will receive $20,000.

In a subsequent distribution where there is $2,000 to distribute, the multiplier would be $2,000/$200,000 and would equal 1%. In the subsequent distribution, each Claimant would receive $1,000. In total, Claimant A would receive $1,000 from the Receiver Estate from the subsequent distribution, which when combined with Claimant A's Actual Return would equal a combined return of $21,000. Claimant B would also receive $21,000. However, Claimant B's total return would come solely from the Receiver Estate through the initial and subsequent distributions.

While the total amount of distribution *from the Receiver Estate* differed for each Claimant, each Claimant ultimately received the same percentage (21%) of their Actual Deposit.

**EXAMPLE 2**:

Assuming hypothetically there is $40,000 for distribution in the initial distribution and there are two Claimants. Claimant A deposited $50,000.00 and Claimant B deposited $150,000.00. The multiplier would be $40,000/$200,000 and would equal 20%. In this case, 20% of the Actual Deposit for Claimant A is $10,000 and for Claimant B is $30,000.

Assume also that Claimant A received an Actual Return of $10,000 from the Ponzi scheme and Claimant B received no Actual Return. Because Claimant A received an Actual Return of $10,000, he will get nothing in the initial distribution. Claimant B, because he received no Actual Return, will receive $30,000.

In a subsequent distribution where there is $2,000 to distribute, the multiplier would be $2,000/$200,000 and would equal 1%. In the subsequent distribution, Claimant A would receive $500.00 and Claimant B would receive $1,500.00. In total, Claimant A would receive $500.00 from the Receiver's Estate in the subsequent distribution, which when combined with Claimant A's Actual Return would equal a combined return of $10,500.00. Claimant B would receive $31,500.00. However, Claimant B's total return would come solely from the Receiver Estate through the initial and subsequent distributions.

While the total amount of distribution *from the Receiver Estate* differed for each Claimant, each Claimant ultimately received the same percentage (21%) of their Actual Deposit.

(c)    Subsequently, the Receiver will make a final distribution in accordance with the terms of this Plan upon discovery and/or liquidation of additional assets and the conclusion of the Receivership. The Receiver is currently pursuing IRs and others who benefitted financially from the 3HB and continues to search for other assets hidden by the 3HB and/or their associates.

### Section 4.4     Method of Payment

Distribution payment for each Claim shall be made from the Receiver Estate in the form of a check made payable to the Claimant(s) as it is listed on the Amended Schedule of Net Loss Amounts and Initial Distribution Amounts approved by the Court.

## SECTION 5-OTHER RELATED MATTERS

### Section 5.1:    Acceptance of Payment Effects Release

Upon acceptance of any Distribution payment from the Receiver, any and all asserted and unasserted claims, demands, rights, and causes of action of any nature that a Claimant may have against the Receiver Estate, the Receiver, and/or any member of the Receiver Team shall be deemed to be discharged, released, extinguished, or satisfied. Notwithstanding the foregoing, nothing in this Plan is intended to nor should be construed to release or limit any claims against or obligations of 3HB or any other person or entity other than the Receiver and the members of the Receiver Team.

### Section 5.2:    Limitation of Receiver's Liability for Payments

Without any limitation to the description of limitation of liability afforded to the Receiver and his team in the Court Orders, neither the Receiver nor any member of the Receiver Team shall have any liability to any person or entity for any action taken in good faith in connection with or

related to the administration of the Receiver Estate, including the implementation of this Plan. In the event that such a claim or cause of action is asserted against the Receiver or any member of the Receiver Team, the Receiver or Receiver Team member shall be entitled to a defense by counsel of his or her choice, payable as any other Administrative Expense herein, even if willful misconduct is alleged.

### Section 5.3:    Checks Not Cashed

Any check issued to a non-active military Claimant that is not cashed within 120 days of the date of the check shall be deemed void, and the Claim pursuant to which check was issued automatically shall be deemed to have been satisfied. Any check issued to an active military Claimant that is not cashed within 240 days of the date of the check shall be deemed void, and the Claim pursuant to which check was issued automatically shall be deemed to have been satisfied. With respect to any such voided check, the intended recipient shall have no right or claim of any kind against the Receiver or the Receiver Estate, including any claim for the amount of the intended distribution or any future distribution. The Receiver will make a reasonable inquiry regarding any uncashed checks.

### Section 5.4:    Final Report

As soon as reasonably practical after making the final Distribution in accordance with Section 4, above, the Receiver shall file with the Court, a Final Report providing the following information:

(a)    The activities engaged in or to be undertaken in winding-up the Receiver Estate;

(b)    A financial statement for the Receiver Estate indicating the receipt and disbursement of money by the Receiver during the course of the Receivership; and

(c)    The Receiver's proposal regarding the use of any monies or other assets remaining in the Receiver's Estate.

### Section 5.5:    Receivership Orders Remain in Force and Effect

This Plan in no way should be deemed to modify, amend, or otherwise limit the Receiver's ability and authority provided for in the Receivership Orders, including the continued use and administration of the assets of the Receiver Estate.

Having reviewed and considered the within and foregoing Plan in light of the facts and circumstances related to the subject receivership,

IT IS HEREBY ORDERED that within the foregoing Plan for Claims Administration and Distribution of Proceeds is APPROVED.

**IT IS SO ORDERED** this 1st day of July, 2011.


/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina